IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NUMBER 25-135 |
| | : | |
| OSCAR NAVAS-RIXTUN | : | |

**DEFENDANT'S SENTENCING MEMORANDUM
AND MOTION FOR A DOWNWARD VARIANCE**

Oscar Navas-Rixtun submits this sentencing memorandum to aid the Court in determining a sentence that is sufficient, but not greater than necessary, to meet the statutory goals pursuant to 18 U.S.C. § 3553(a) and *United States v. Booker*, 543 U.S. 220 (2005). In this case, the recommended sentencing guideline range is four to ten months of imprisonment based on an offense level of eight and a criminal history category of II. Mr. Navas-Rixtun has been in continuous custody since he was arrested on unrelated state charges on March 7, 2024. He was transferred to the Federal Detention Center on March 20, 2025, and he will be deported to Guatemala upon completion of his sentence in this case. Mr. Navas-Rixtun's status as a "deportable alien" will preclude any participation in programming within the BOP. The defense respectfully suggests a sentence within the recommended guideline range would be greater than necessary to achieve the sentencing goals of 18 U.S.C. §3553(a) and submits that a sentence of time served, which amounts to three months of imprisonment, is appropriate.

I. **PROCEDURAL HISTORY**

On April 3, 2025, a federal grand jury in the Eastern District of Pennsylvania returned a one-count Indictment charging Mr. Navas-Rixtun with illegally reentering the United States

following deportation, in violation of 8 U.S.C. §1326(a).  On May 5, 2025, he appeared before this Court and pled guilty to the Indictment.

## II.     MR. NAVAS-RIXTUN'S PERSONAL HISTORY

Born in the highlands of Mataquescuintla, Guatemala, Navas-Rixtun grew up in abject poverty[1] alongside his eight siblings, parents, and several extended family members during a period in which the country experienced an almost 40-year civil war. [2]   His large family lived in a small shack-like house consisting of wooden boards and a tin roof, and they had no electricity or running water.  Their meals consisted mainly of corn patties and beans, and malnutrition and other poverty-induced health issues were common.  Mr. Navas-Rixtun's family was too poor to send him to school, so he has no formal education and has been working since childhood.

Mr. Navas-Rixtun has three living children[3] who live with their mother in Guatemala.  In an effort to provide a better life for them, he made the difficult decision to come to the United States where he was able to earn higher and more consistent wages than he could in his home country.  During his time in the United States, he worked in the construction and restaurant

---

[1] Guatemala is currently facing a complex humanitarian crisis marked by severe food insecurity, widespread malnutrition, and the compounding effects of climate-related shocks.  World Food Programme (WFP), *Guatemala: Annual Country Report 2024*, 3, https://docs.wfp.org/api/documents/WFP-0000165365/download/ (last accessed June 16, 2025).  The crisis is further intensified by entrenched systemic vulnerabilities. *Id.*  One-sixth of Guatemala's population lives on less than $2.00 per day, and developmental stunting in children under five years old is among the highest in the world and the highest in Latin America and the Caribbean.  WFP, *Guatemala Country Brief, March 2025*, 1, https://docs.wfp.org/api/documents/WFP-0000165797/download/ (last accessed June 16, 2025).

[2] The Guatemalan Civil War occurred from 1960-1996.  DANIEL WILKINSON, SILENCE ON THE MOUNTAIN: STORIES OF TERROR, BETRAYAL, AND FORGETTING IN GUATEMALA, 2-4, 225-36 (Gilbert M. Joseph & Emily Rosenberg ed., Duke University Press 2004) (2002).  Among the collective traumas imposed on the country's citizens during that time period was the mass killing of an estimated 200,000 indigenous people by successive military governments that first took power following a Central Intelligence Agency (CIA)-instigated coup in 1954, which "began [Guatemala's] long, terrifying descent into a state of lawlessness, cruelty, and despair." *Id.* at 83-84, 180-85, 324-28.

[3] His fourth child passed away a few years ago as a result of what doctors colloquially term "failure to thrive," likely caused by malnutrition.

industries, sending most of his earnings back to his family in Guatemala. He committed the instant offense out of love, desperation, and the hope of changing his family's difficult circumstances. Nevertheless, he swiftly pled guilty and accepted responsibility for his offense, and he makes no excuses for it. His present incarceration and painful separation from his family have provided enough of a deterrent to returning to the United States without proper documentation in the future. While every federal felony offense is arguably serious, this one is nonviolent, was committed under mitigating circumstances, and will be followed by deportation.

### III. APPLICATION OF THE STATUTORY FACTORS TO THIS CASE

The Court must consider all the factors identified in 18 U.S.C. § 3553(a) and impose a sentence that is "sufficient, but not greater than necessary" to satisfy the purposes of sentencing. 18 U.S.C. § 3553(a)(1). In this case, a sentence of time served satisfies these factors.

#### A. The Nature and Circumstances of the Offense and History and Characteristics of Mr. Navas-Rixtun

Mr. Navas-Rixtun's difficult life, work history, motive for committing the instant offense, and the amount of time he has been in custody all weigh in favor of a time served sentence. His reason for reentering the United States after deportation was not one of greed or malice, but simply to earn a decent living and support his family, which is exactly what he did. By no fault of his own and simply by virtue of where he was born, he has faced experiences and living conditions that most people born in the United States do not even have to contemplate. He has proven to be a hard worker, dedicated father, and resilient person. A time served sentence would therefore appropriately take into account this § 3553(a) factor.

3

### B.    The Need for the Sentence Imposed to Promote Certain Statutory Objectives

*1.    To reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense*

A guideline sentence is not necessary to satisfy the above statutory objectives and would be overly punitive.  Mr. Navas-Rixtun's period of incarceration has been especially difficult given the separation from and inability to communicate with his family.  The guidelines generally account for harm but not at all for the motivation for committing the offense, which is highly relevant and mitigating in this case.  Mr. Navas-Rixtun understands that he should not have returned to the United States; however, this was not a crime of greed, violence to others, or malice.  A sentence slightly below the range would not promote a lack of respect for the law as Mr. Navas-Rixtun is presently incarcerated and will remain in custody at a minimum until deportation.  Likewise, below-guideline sentences are relatively common for many similarly compelling reasons and do not undermine respect for the law.

*2.    To afford adequate deterrence to criminal conduct*

A time served sentence will provide deterrence from reentering the United States in the future.  Mr. Navas-Rixtun knows that any future attempts to enter the United States will result in additional incarceration in accordance with a higher sentencing guideline range.  It must also be noted that the current political climate speaks to overly harsh, intensified immigration enforcement increasing the likelihood that Mr. Navas-Rixtun will be detected and prosecuted if he attempts to reenter the United States in the future.

*3.    To protect the public from further crimes of the defendant*

Mr. Navas-Rixtun poses no threat to the public.  His criminal history consists of a misdemeanor conviction for reckless endangerment and a felony conviction for illegal entry into

4

the United States. Moreover, he poses no future threat because he will be transferred into ICE custody for deportation upon completion of his sentence.

> 4. *To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner*

Fortunately, Mr. Navas-Rixtun has no major medical concerns at this time, and a sentence calling for additional incarceration will not meet any educational or vocational needs. His status as a "deportable alien" will preclude his access to programs available to similarly-situated United States citizens, including literary and ESL programs. 28 C.F.R. § 544.51(b) ("Generally, inmates under orders of deportation, exclusion, or removal may participate in an institution's occupational education program if Bureau resources permit after meeting the needs of other eligible inmates"); 28 C.F.R. § 544.41(a)(3). In essence, Mr. Navas-Rixtun would only be permitted to participate in educational and occupational programs after all eligible United States citizen inmates are enrolled—an unlikely scenario considering budgetary restraints.

Critically, the financial cost of additional incarceration should not be overlooked. As indicated in Paragraph 53 of the modified presentence report (PSR), it will cost the United States $4,147.00 per month to keep Mr. Navas-Rixtun in the Bureau of Prisons before ultimately deporting him to Guatemala.

### C. Kinds of Sentences Available

The range of sentences statutorily available to the Court, including the advisory guidelines range of four to ten months of incarceration, is listed in Part D of the PSR. While the Court may statutorily impose a period of up to three years of supervised release, the Sentencing Guidelines explicitly discourage the Court from imposing any period of supervised release. U.S.S.G. § 5D1.1(c) ("The court ordinarily should not impose a term of supervised release in a

case in which supervised release is not required by statute and the defendant is a deportable alien who likely will be deported after imprisonment). The Court should follow this guidance and decline to impose a period of supervised release in this case.

## IV.     **CONCLUSION**

Mr. Navas-Rixtun stands before this Court having fully accepted responsibility for his actions. He knows and accepts his inevitable deportation to Guatemala. He understands that he cannot return to the United States without permission and that doing so will result in additional criminal charges and further incarceration. Considering all arguments articulated herein, as well as any brought to the Court's attention at the time of sentencing, Mr. Navas-Rixtun respectfully requests the Court impose a sentence of time served.

Respectfully submitted,

*/s/ Katrina Young*
KATRINA YOUNG
Assistant Federal Defender

## CERTIFICATE OF SERVICE

    I, Katrina Young, Assistant Federal Defender, Federal Community Defender Office for the Eastern District of Pennsylvania, hereby certify that I have caused a copy of the Defendant's Sentencing Memorandum and Motion for a Downward Variance to be filed and served electronically through the Eastern District Clerk's Office Electronic Case Filing System ("ECF") upon Robert Eckert, Assistant United States Attorney, United States Attorney's Office, 615 Chestnut Street, Suite 1250, Philadelphia, Pennsylvania 19106.

                                                  */s/ Katrina Young*
                                                  KATRINA YOUNG
                                                  Assistant Federal Defender

DATE:       June 18, 2025